Filed 9/4/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHRISTOPHER SORENSON, <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF MONTEREY COUNTY, <br><br> Respondent; <br><br> THE PEOPLE, et al., <br><br> Real Parties in Interest. | No. H038295 <br> (Monterey County <br> Super. Ct. Nos. SS112361, MH4621, <br> MH4654, MH4924, MH4928, <br> MH4934, MH5082, MH5119, <br> MH5129) |

The County of Monterey in two separate proceedings sought to involuntarily commit petitioner Christopher Sorenson, pursuant to the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq; LPS Act or Act).[1] These LPS conservatorship proceedings resulted in two jury trials, occurring in June and November 2011, to determine whether Sorenson was gravely disabled due to mental illness within the meaning of the LPS Act. Sorenson was not involuntarily conserved.

Sorenson was subsequently charged with the murder of his mother, her death occurring just eight days after the conclusion of the second LPS trial. The Monterey County District Attorney, on behalf of the People, made an informal request to the court

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

reporter for copies of the reporter's transcripts of the two LPS jury trials as an aid to the prosecution of the charged crime. Additionally, a local newspaper, The Salinas Californian (The Californian), requested that the court clerk give it access to the entire files from those two LPS proceedings. The presiding judge of the superior court denied both requests in separate minute orders, reasoning that the court files were confidential under the Act. The People then filed a formal motion for an order granting access to copies of the reporter's transcripts of the two LPS jury trials. One week later, a second local newspaper, The Monterey County Herald (The Herald), filed a motion requesting that the court grant it access to the court files of eight LPS proceedings involving Sorenson. The Herald's motion was later joined by The Californian.[2] After briefing and a hearing, a different superior court judge—assigned by the presiding judge to hear all matters pertaining to Sorenson, including the pending requests by the People and the media—granted the People, the media, and Sorenson access to the reporter's transcripts of the two LPS jury trials. Sorenson challenges that order by this petition for writ of mandate.

Very significant, competing interests are claimed by the parties. Sorenson claims that the release of the trial transcripts would violate (1) section 5118, which (he claims) makes LPS trials presumptively nonpublic, (2) his right to confidentiality under section 5328 of the Act, (3) his constitutional right to privacy, and (4) his confidentiality rights under the psychotherapist-patient privilege. The People and the media claim a First Amendment right of public access to the LPS trial transcripts, because such a constitutional right exists for all "ordinary civil trials and proceedings." (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1212 (*NBC Subsidiary*).) They also claim a statutory right of access under Code of Civil Procedure section 124,

---

[2] Hereafter, The Californian and The Herald are collectively referred to as the media.

2

which provides that, absent express statutory exceptions, "the sittings of every court shall be public"; they contend that section 5118 is not such a statutory exception.

We conclude that the court erred in granting the People and the media access to the transcripts from Sorenson's two LPS jury trials. In so holding, we conclude that involuntary conservatorship proceedings under the LPS Act are not "ordinary civil trials and proceedings" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1212) that are presumptively public. Rather, they are special proceedings. But they are not special proceedings for which there is a qualified First Amendment right of public access. There is not such a tradition of openness or utility associated with having the proceedings public to support a finding of a constitutional right of access. Furthermore, section 5118 makes LPS jury trials presumptively nonpublic, thereby constituting a statutory exception to Code of Civil Procedure section 124's general requirement that such "sittings . . . be public." We hold that the superior court erred in concluding that, notwithstanding that LPS jury trials are presumptively nonpublic, the parties by their conduct "were deemed to have 'requested' [under section 5118] that the hearings be public." We will therefore grant the petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

The People are prosecuting Sorenson for murder in Monterey Superior Court Case Number SS112361.[3] On December 21, 2011, a reporter from The Californian made a written request by two-sentence letter to the respondent superior court "to view and/or

---

[3] The information is not attached to the petition; details concerning the criminal prosecution are unknown to this court. The record, however, indicates that on February 21, 2012, the superior court found Sorenson incompetent to stand trial. By subsequent correspondence from the People, we have been advised that criminal proceedings were reinstated in September 2012. After a preliminary hearing in October 2012, the court bound Sorenson over for trial on the one count alleged in the information. Sorenson then entered a not guilty plea, but the court again suspended criminal proceedings in January 2013. The court reinstated criminal proceedings on February 5, 2013. On February 19, 2013, Sorenson entered a plea of not guilty by reason of insanity.

3

make copies of the case files" in two LPS proceedings involving Sorenson (Case numbers MH004654 and MH005129). The reporter indicated that the request was made because "there may be information in those documents that is the public's right to know." At or about the same time, the People, through the Monterey County District Attorney's Office, made an informal request to the court reporter for copies of the jury trial transcripts in those two proceedings.[4] The court (Presiding Judge Timothy Roberts) denied the two requests by separate orders dated January 18, 2012, observing that LPS conservatorship hearings and their associated court files were "deemed confidential.".

On February 1, 2012, the People filed a pleading captioned "request for reconsideration of order denying request for transcripts of jury trial." (Capitalization omitted.) In that motion, the People requested that the court "allow [them] to inspect the records of Mr. Sorenson's [LPS conservatorship] trials, and to obtain the trial transcripts at [their] cost." One week later, The Herald filed a motion (labeled "petition") to examine the sealed-records files of eight LPS proceedings involving Sorenson—the two proceedings identified in The Californian's prior letter request (Case numbers MH004654 and MH005129), along with six other identified cases. A declaration and memorandum of points and authorities were attached to The Herald's motion.

On March 19, 2012, a different superior court judge (Judge Mark E. Hood) set a hearing on the People's and The Herald's motions, identifying five legal issues for consideration.[5] According to Judge Hood's subsequent order, Presiding Judge Roberts had

_____

[4] The record before us does not include the People's informal request. We therefore are unaware of its contents, or even whether it was in writing or merely an oral request.

[5] The five issues the court identified were: (1) whether "LPS proceedings [are] 'ordinary' civil proceedings as contemplated by Code of Civil Procedure [section] 124"; (2) whether "the contents and transcripts of [c]onservatorship matters [are] confidential . . . [§ 5328]"; (3) whether "the passage of [section 5118 had an effect ] on the confidentiality provisions under [section] 5328"; (4) whether "there [was] a demand for a 'public trial' by either party at the two conservatorship trials"; and (5) whether "the

4

"specially assigned these matters . . . for review of issues pertaining to requests to access any information contained in the above-referenced [LPS] cases and for reconsideration of any of his prior rulings." Further briefs were submitted on behalf of the People, The Herald,[6] and Sorenson. The Herald indicated in its brief that it was seeking an order (1) unsealing the transcripts of Sorenson's two LPS jury trials, (2) unsealing all of the records of eight enumerated mental health proceedings involving Sorenson, and (3) "correcting the systematic and automatic sealing of all records relating to LPS Act proceedings."

After hearing argument and taking the matter under submission, the court entered an order on May 2, 2012, granting the People, the media, and Sorenson access to copies of the reporter's transcripts of the jury trials conducted in two LPS proceedings involving Sorenson (case numbers MH005082 and MH005129). In so ruling, the court held that hearings under the LPS Act are nonpublic unless either party requests a public hearing; neither party requested a public hearing in either of the LPS trials in controversy; the record indicated that the trials proceeded as public hearings without objection by either party; and therefore the parties by their conduct were "deemed to have 'requested' that the hearings be public" under section 5118. The court also denied the media's request for "access to all files and records associated with [Sorenson's] LPS Act proceedings," concluding that the files and information were confidential and not discoverable under section 5328. The court issued a 15-day temporary stay of its order.

On May 16, 2012, Sorenson filed a petition for writ of mandate or prohibition and a request for temporary stay with this court. On the same date, we granted a temporary stay

suspension of criminal proceedings pursuant to Penal Code [section] 1368 *et sequitur* affect[s] the People's request."

[6] The initial motion to unseal records was filed only on behalf of The Herald, as was the first brief following the court's order of March 19, 2012. But in a supplemental brief, counsel for The Herald indicated that relief was being sought on behalf of The Californian as well.

5

of respondent court's order and invited real parties in interest to submit preliminary opposition to the petition. After receiving the People's preliminary opposition and Sorenson's reply, we issued an order directing respondent court to show cause why a peremptory writ of mandate should not issue as requested in the petition. The People filed a return to the petition,[7] and Sorenson filed a formal reply.

DISCUSSION

I.      *Request for Dismissal and Mootness*

On April 26, 2013, after briefing was concluded, Sorenson filed, by one-sentence letter, a request that the court dismiss his petition. The language of the letter was uninformative, and vaguely referenced exhibits attached to the People's prior motion to dismiss,[8] which dismissal motion this court denied without prejudice.[9] But the apparent basis for Sorenson's request was that he had entered a change of plea in February 2013 and pleaded not guilty by reason of insanity, and thereafter had signed a document

---

[7] Real parties in interest The Herald and The Californian did not file informal oppositions or returns to the petition. After briefing was concluded, in April 2013, The Herald, in its opposition to the People's motion to dismiss (discussed, *post*), requested leave to be deemed to have joined in the People's return to the petition or, alternatively, to have its opposition to the dismissal motion treated as its return to the petition. The Herald contended that because the People's "[r]eturn expressly asserted the public's right of access and hence preserved that issue for appeal, because [T]he Herald's resources are limited, and because [T]he Herald had no reason to believe that the [People] would not continue to assert the public's right of access, [T]he Herald did not previously file a return . . . or join in the [People's] return." Given that the petition raises issues of continuing public interest and the People, in fact, argued that the court transcripts are records accessible by the public, we will deem The Herald's opposition to the motion to dismiss as a return to the petition.

[8] On April 12, 2013, the People had also filed a motion to dismiss the petition, asserting that the matter has been rendered moot by virtue of Sorenson's subsequent entry of a plea of not guilty by reason of insanity in the criminal proceeding. On April 22, 2013, this court denied the motion to dismiss without prejudice.

[9] The complete text of Sorenson's letter reads: "In light of the exhibits attached to real party Monterey County District Attorney's Office['s] Motion to Dismiss, petitioner respectfully requests to withdraw his Writ of Mandate/Prohibition [Petition]."

indicating that he "conditionally waive[d] any privacy rights to the transcripts of [the LPS trials]," as well as privacy rights to any reports generated by doctors who may have evaluated him in connection with the two LPS trials. Sorenson acknowledged in this conditional waiver that he understood that the parties who received the reports and transcripts would be subject to a court protective order preventing disclosure of the materials to others.

We denied Sorenson's request for dismissal because this case presents issues of continuing public interest, including the scope of the First Amendment right of public access to judicial proceedings, and whether LPS proceedings, including trials, are made presumptively nonpublic by statute. (See *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1202, fn. 8 [court may decline dismissal of moot case "where the appeal raises issues of continuing public importance"]; *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 746-747 [court, regardless of mootness, may decide case involving " 'matter[s] of continuing public interest . . . likely to recur' "].)[10] Additionally, while the post-petition developments alluded to in Sorenson's dismissal request may meet the needs of the People and Sorenson insofar as the trial court's order granting *them* access to the LPS jury trial transcripts is concerned, it does not render the controversy moot. Were we to permit dismissal of the petition, The Herald and The Californian would also be entitled to receive copies of the two LPS jury trial transcripts by virtue of the challenged order, an order we will conclude to have been erroneous.[11] We have therefore exercised our

---

[10] We note in passing that, ironically, the high court in the case discussed at great length herein, *NBC Subsidiary*, *supra*, 20 Cal.4th 1178, was also faced with a mootness question due to the fact that the trial proceedings being reviewed had terminated as a result of the parties' having settled the dispute during jury deliberations. (*Id.* at p. 1190, fn. 6.) The high court determined that it should resolve the controversy, notwithstanding its mootness, because of its presentation of "an important question affecting the public interest that is ' " 'capable of repetition, yet evading review.' " ' [Citation.]" (*Ibid.*)

[11] In addition, were the petition dismissed, there would remain a potential conflict between the challenged order, under which the People have been determined to be

7

discretion to deny Sorenson's request for dismissal and will decide the controversy raised by the petition. (See *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1014 [court, despite parties' settlement of case after briefing and argument, may elect to decide merits of controversy involving matter of continuing public interest].)

II.     *Propriety of May 2, 2012 Order in Light of Court's Prior Orders*

During oral argument, we raised a procedural question concerning the propriety of the May 2, 2012 order of Judge Hood, given the fact that Presiding Judge Roberts, approximately four months earlier, had issued two orders seemingly addressing the same or similar issues concerning access to the transcripts of Sorenson's LPS trials. Specifically, we asked counsel whether Judge Hood had the authority to grant the People, the media, and Sorenson access to the transcripts in light of Presiding Judge Roberts's prior orders denying The Californian's and the People's requests for access to two of Sorenson's LPS files and the reporter's transcripts, respectively. This court requested supplemental briefing, which it subsequently received from Sorenson, the People, and The Herald. Upon consideration of the issue, we conclude that Judge Hood had the authority to issue the May 2, 2012 order, and we may therefore consider the merits of Sorenson's petition.

At the time The Herald filed its formal motion in February 2012, the court had not acted on The Herald's request for access to sealed LPS files pertaining to Sorenson.[12] The then-existing orders of Presiding Judge Roberts pertained to the People's informal request to a court reporter, and The Californian's letter request to the clerk. The Herald's formal, six-page motion contained a declaration and a memorandum explaining in detail

---

entitled to unfettered access to, and use of, the LPS trial transcripts, and any order that may be entered in reliance upon Sorenson's recent conditional waiver, under which the People may be granted such access subject to a court protective order preventing disclosure of the transcripts to others.

[12] Indeed, Sorenson below characterized The Herald's motion as a "new request."

8

its legal position, including a citation to *NBC Subsidiary*, *supra*, 20 Cal.4th 1178. Further, the relief sought by The Herald in its motion and in supplemental memoranda was significantly broader than that requested previously by either The Californian or the People: The Herald requested the unsealing of eight LPS files involving Sorenson, an unsealing of the transcripts of Sorenson's two LPS jury trials, and an administrative order "correcting the systematic and automatic sealing of all records relating to LPS Act proceedings." The Herald's motion thus stood in stark contrast to The Californian's prior, two-sentence letter request to the clerk seeking to inspect or copy two of Sorenson's LPS files because they might contain "information . . . that is the public's right to know." Because The Herald's motion involved a request for access to court files and an order unsealing all LPS files made by an entity not involved in any prior proceedings that prompted the issuance of Presiding Judge Roberts's prior orders, those orders did not act as an impediment to Judge Hood's subsequent action on The Herald's motion.

With respect to the court's internal reassignment of the motions to Judge Hood, we are mindful of the limitations involved in one judge, by subsequent order, nullifying a prior ruling by another judge of the same superior court. (See *In re Alberto* (2002) 102 Cal.App.4th 421, 426-428.) But the rationale behind the general rule limiting the power of the former judge under those circumstances—(1) discouraging "forum shopping" by the parties, and (2) preventing the later-ruling judge from becoming "a one-judge appellate court" (*id.* at p. 427)—do not pertain to this case. The orders denying access to the People and The Californian made by Presiding Judge Roberts were not the result of a motion process involving submission of formal requests to the court upon noticed motions supported by appropriate points and authorities and declarations. (See Code Civ. Proc., §§ 1003 ["application for an order is a motion"], 1005.5 ["motion upon all grounds stated in the written notice thereof is deemed to have been made and to be pending before the court for all purposes, upon the due service and filing of the notice of motion, but this

9

shall not deprive a party of a hearing of the motion to which he is otherwise entitled"].)[13]

Rather, the orders were prompted by the People's informal (perhaps oral) request to the court reporter, and The Californian's two-sentence letter to the court clerk. Since neither the People nor The Californian had submitted a prior application that resulted in the initial January 2012 orders of Presiding Judge Roberts—and The Herald had made no access request at all—Judge Hood, after reassignment to him of the motions requesting access, was not precluded from ruling on those motions.[14]

Presiding Judge Roberts's reassignment of these matters to Judge Hood, who was presiding over the criminal proceedings pending against Sorenson, was also authorized by statute and court rule. Under Government Code section 69508, subdivision (a), "the presiding judge shall distribute the business of the court among the judges, and prescribe

---

[13] We acknowledge that the People captioned their motion "request for reconsideration of order denying request for transcripts of jury trial." (Capitalization omitted.) But because this pleading did not seek modification, amendment, or revocation of an order that had resulted from "an application for an order . . . made to a judge, or to a court" (Code Civ. Proc., § 1008, subd. (a)), or constituted a "subsequent application for the same order upon new or different facts, circumstances, or law" (Code Civ. Proc., § 1008, subd. (b)), it did not constitute a motion for reconsideration or a renewed motion within the meaning of Code of Civil Procedure section 1008. (See *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1105 [Code of Civ. Proc., § 1008 "impos[es] a limitation on the parties' ability to file repetitive motions"]; see also *Standard Microsystems Corp. v. Winbond Electronics Corp.* (2009) 179 Cal.App.4th 868, 890 ["merely asking the court to grant relief that is *inconsistent with* a prior order, whether by the same or a different judge, is not a 'motion for reconsideration' "].) The fact that The People's motion was captioned "request for reconsideration" is of no consequence. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 187, 193 [" 'nature of motion is determined by the nature of the relief sought, not by the label attached to it' "].)

[14] As noted, Presiding Judge Roberts's orders were not the result of prior applications or motions for access having been filed and heard by the court. We therefore express no opinion concerning whether (hypothetically) it would have been proper for Presiding Judge Roberts, under Code of Civil Procedure section 1008, to have reassigned to a different judge a motion to reconsider or a renewed motion for access following an order he had entered based upon an application for access.

10

the order of business."  "Assignments of the 'business' of the court among judges of the court is wholly discretionary." (*Anderson v. Phillips* (1975) 13 Cal.3d 733, 737.)  Rule 10.603 of the California Rules of Court delineates the authority vested in the presiding judge with respect to judicial assignments, providing that the presiding judge "has ultimate authority to make judicial assignments." (Cal. Rules of Court, rule 10.603(c)(1).)  "Rule 10.603(b)(1)(A) and (B) authorizes the presiding judge to '[a]ssign judges to departments,' 'designate supervising judges for divisions,' and '[a]pportion the business of the court, including assigning and reassigning cases to departments.'  Rule 10.603(c)(1)(D) directs the presiding judge to '[r]eassign cases between departments as convenience or necessity requires.'  Rule 10.603(d) permits the presiding judge to delegate any of the duties listed in the rule to another judge." (*Alvarez v. Superior Court* (2010) 183 Cal.App.4th 969, 978.)

Moreover, Judge Hood was empowered to decide the applications for access because they involved claimed public access rights under the First Amendment.  As noted by the court in *In re Marriage of Nicholas* (2010) 186 Cal.App.4th 1566, 1575 (cited by both the People and The Herald), "Since orders to seal court records implicate the public's right of access under the First Amendment, they inherently are subject to ongoing judicial scrutiny, including at the trial court level."  In *Marriage of Nicholas*, the court rejected the appellant's jurisdictional challenge to a sealing order (the eighth in a succession of orders) based upon its having been entered by a different judge from the one who issued the prior sealing order of which the appellant was the proponent.  (*Id.* at pp. 1574-1578.)  The court came to this conclusion based upon, inter alia, the above-quoted principle and the fact that rule 2.551(h) of the California Rules of Court expressly authorizes the court to unseal its records upon the request of any person, whether a party to the litigation or not (*Marriage of Nicholas*, at p. 1577).

The reassignment of the motions to Judge Hood was a proper exercise of the Presiding Judge's discretion.  Judge Hood was therefore authorized to entertain the

11

People's and The Herald's motions for access to Sorenson's LPS files. Accordingly, we reject Sorenson's claim that Judge Hood did "not possess the legal authority to issue a superceding [*sic*] order overruling Judge Roberts'[s] original order."

III.     *Contentions of the Parties*

Sorenson acknowledges that under our high court's decision in *NBC Subsidiary*, *supra*, 20 Cal.4th 1178 and Code of Civil Procedure section 124, court records are presumptively open to the public. But he argues that, the presumption of openness notwithstanding, LPS proceedings are nonpublic. He contends that LPS proceedings are "unique" and are "especially designed to help encourage mental health treatment, protect the public, safeguard the rights of mental health patients, and encourage persons with mental health problems to seek treatment on a voluntary basis. [Citations.]" He asserts that section 5118 creates a presumption that LPS proceedings are nonpublic, insofar as that statute provides that any party to them may demand that a hearing be public. And he argues that the court erred when it found, based upon inadmissible hearsay, that the parties were "deemed to have 'requested' that the hearings be public" under section 5118.

The People respond that, although the trial court's reasoning may have been incorrect, it reached the correct result in permitting access to the LPS trial transcripts. They (along with The Herald) argue that, pursuant to both the First Amendment (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1212) and statute (Code of Civ. Proc., § 124), there is a public right of access to LPS jury trials. And they assert that there is no statutory language creating a presumption that LPS proceedings are nonpublic. They contend, in essence, that had the Legislature wished to make LPS jury trials confidential, it could have easily done so. Instead, the language of section 5350, giving a proposed conservatee the right to demand a jury, says nothing about confidentiality. And they contend that section 5118 cannot be read as requiring that LPS jury trials be nonpublic. Therefore, they argue, the trial court correctly granted their request for copies of the trial transcripts.

12

IV.    *The LPS Act*

The Legislature enacted the LPS Act in 1967.  (See Stats. 1967, ch. 1667, § 36, p. 4074.)  Included among the goals of the Act are "ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program.  (§ 5001.)  The act limits involuntary commitment to successive periods of increasingly longer duration, beginning with a 72-hour detention for evaluation and treatment (§ 5150), which may be extended by certification for 14 days of intensive treatment (§ 5250).  That initial period may be extended for an additional 14 days if the person detained is suicidal.  (§ 5260.)  In those counties that have elected to do so, the 14-day certification may be extended for an additional 30-day period for further intensive treatment.  (§ 5270.15.)  Persons found to be imminently dangerous may be involuntarily committed for up to 180 days beyond the 14-day period.  (§ 5300.)  After the initial 72-hour detention, the 14-day and 30-day commitments each require a certification hearing before an appointed hearing officer to determine probable cause for confinement unless the detainee has filed a petition for writ of habeas corpus.  (§§ 5256, 5256.1, 5262, 5270.15, 5275, 5276.)  A 180-day commitment requires a superior court order.  (§ 5301.)" (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1009.)

"The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled.  (§ 5150 et seq.)  The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement (§ 5350.1).  As defined by the Act, a person is 'gravely disabled' if, as a result of a mental disorder, the person 'is unable to

13

provide for his or her basic personal needs for food, clothing, or shelter.' (§ 5008, subd. (h)(1)(A).)" (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142.) Under the Act, a conservator of a gravely disabled person may be appointed for up to one year (§ 5350), subject to a petition to reestablish the conservatorship for additional one-year periods before the expiration of each one-year term (§§ 5361, 5362). Because an involuntary civil commitment constitutes a deprivation of liberty and places a stigma upon the conservatee's reputation, due process under the California Constitution requires that a finding of grave disability in an LPS jury trial must be unanimous and based upon proof beyond a reasonable doubt. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235; see also *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 541 ["[b]ecause of the important liberty interests at stake, correspondingly powerful safeguards protect against erroneous findings"].)

V.      *Standard of Review*

We will consider (see pt. VI.B., *post*) whether the First Amendment right of public access applies to LPS conservatorship trials. Where the issue to be decided implicates First Amendment rights, appellate courts are required to conduct an independent review of the record. (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1021, citing *In re George T.* (2004) 33 Cal.4th 620, 630-631; see also *Copley Press, Inc. v. Superior Court* (1998) 63 Cal.App.4th 367, 375 ["decisions in cases claiming First Amendment rights are reviewed de novo"].)

We also address (see pt. VI.C., *post*) whether section 5118 constitutes an exception to Code of Civil Procedure section 124's general requirement that "the sittings of every court shall be public." The answer to this question is driven by our interpretation of the language of section 5118, a matter subject to de novo review. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 ["[s]tatutory interpretation is a question of law that we review de novo"]; see also *Mercury Interactive Corp. v. Klein*

14

(2007) 158 Cal.App.4th 60, 81 [de novo review of California Rules of Court concerning sealing of court records].)

Lastly, we examine (see pt. VI.D., *post*) whether the court erred in concluding that there had been a de facto demand by the parties under section 5118 that Sorenson's LPS jury trials be public. The facts utilized by the court in reaching this determination are undisputed. Since the historical facts are settled, the issue of whether the parties demanded public trials within the meaning of section 5118 is a question of law subject to independent review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800; see also *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384-387 [factual issues not in dispute and sole question of whether, on facts presented, arbitrator was required to disclose matter affecting impartiality, reviewed de novo].) And, as we discuss, to the extent the court determined that Sorenson had effectively demanded public trials, it also implicitly found that he had waived his privacy rights and his right to assert the psychotherapist-patient privilege. A determination of waiver that is based upon undisputed facts is also a question of law. (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196.)

VI. *Legal Analysis*

The United States Supreme Court has held in a number of cases that there is a First Amendment right of public access to criminal proceedings. Based on these cases, our high court has held that this right also applies to "ordinary civil trials and proceedings." (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1212.)[15] As our high court has explained, this constitutional right is a "qualified" one in the sense that the proceedings "are 'presumptively open' " and in order for them to be ordered closed, the court must give

---

[15] To avoid confusion, we will refer to the California Supreme Court as "our high court" or "the high court," and to the United States Supreme Court as the "Supreme Court."

15

advance notice of the potential closure and must conduct a hearing and must make express findings supporting the closure order and/or the sealing of court records. (*Id.* at p. 1217.)

Following our discussion of *NBC Subsidiary,* we will consider whether a trial under the LPS Act is an "ordinary civil proceeding[]" that is presumptively open. (*Id.* at p. 1213, fn. 30.) After concluding that it is not, we will analyze whether an LPS trial is a special proceeding to which the First Amendment right of access nonetheless applies. Finding that there is no such constitutional right, we will then examine whether section 5118 of the LPS Act provides a specific exception to the general statutory requirement in Code of Civil Procedure section 124 that all court proceedings be open to the public; we will conclude that under section 5118, all LPS proceedings are presumptively nonpublic. Lastly, we will review the trial court's conclusion that, notwithstanding the nonpublic nature of LPS trials generally, the parties in this instance had effectively demanded that the LPS jury trials at issue in this case be public, thereby warranting an order releasing the trial transcripts to the People and the media. We will find that the trial court erred in so concluding.

  A. *Qualified First Amendment Right of Access to Judicial Proceedings*

In *NBC Subsidiary*, our high court addressed the propriety of a closure order in a civil jury trial involving Hollywood celebrities Clint Eastwood and Sandra Locke. (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1182.) The trial court, on its own motion, ordered the closure of all proceedings occurring outside the presence of the jury. (*Id.* at p. 1183.) The *NBC Subsidiary* court determined first that Code of Civil Procedure section 124, a statute that had not been raised by the parties, had "apparent relevance" to the question. (*NBC Subsidiary*, at p. 1190.) That statute reads: "Except as provided in Section 214 of the Family Code or any other provision of law, the sittings of every court shall be public." (Code Civ. Proc. § 124.) The court observed that in interpreting the statute, it was required to consider not only its "language and history, but also . . . the relevant

constitutional principles, relating to public access to court proceedings . . .” (*NBC Subsidiary*, at p. 1192.)  In concluding that the trial court erred in closing those proceedings, the high court conducted an exhaustive review of United States Supreme Court decisions that culminated in five public access cases decided between 1980 and 1986.  (*Id.* at pp. 1199-1207.)

Our high court observed that, beginning with *Richmond Newspapers, Inc. v. Virginia* (1980) 448 U.S. 555 (*Richmond Newspapers*), the Supreme Court had affirmed “that ‘a presumption of openness inheres in the very nature of a criminal trial under our system of justice.’ [Citation.]” (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1200, quoting *Richmond Newspapers*, at p. 573.)  Chief Justice Burger, in the lead opinion, “observed [that] open trials enhance the performance and accuracy of trial proceedings, educate the public, and serve a ‘therapeutic’ value to the community [citation]— and this, considered together with historical tradition, leads to the conclusion that ‘the right to attend criminal trials is implicit in the guarantees of the First Amendment.” (*NBC Subsidiary*, at p. 1200, citing *Richmond Newspapers*, at pp. 569-573, 580.)  As our high court explained, the *Richmond Newspapers* court consequently reversed an order closing a criminal trial, where the trial court had failed to make any findings supporting it and had not considered alternatives less drastic than closure.  Instead, the Supreme Court concluded “that ‘[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.’ [Citation.]” (*NBC Subsidiary*, at p. 1200, quoting *Richmond Newspapers*, at p. 581.)

In *Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 503-504 (*Press-Enterprise I*), the Supreme Court considered challenges to the closure of nearly six weeks of voir dire of prospective jurors, and to a subsequent order denying press access to the voir dire transcripts.  As the *NBC Subsidiary* court explained, “Chief Justice Burger’s majority opinion, invalidating the trial court’s order as violative of the First Amendment, emphasized both (i) the historic tradition of open jury selection in England

17

and colonial America [citation], and (ii) the various utilitarian policies advanced by open jury selection.  [Citation.]" (*NBC Subsidiary*, *supra*, 20 Cal.4th at pp. 1203-1204, citing *Press-Enterprise I*, at pp. 505-508, 508-509.)  The Supreme Court articulated that " '[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " (*NBC Subsidiary*, at p. 1204, quoting *Press-Enterprise I*, at p. 510.) The Supreme Court invalidated the closure order because it was not accompanied by specific findings indicating the closure's necessity, and the court had failed to consider any alternatives to closure of the voir dire proceedings and the transcripts' sealing.  (*NBC Subsidiary*, at pp. 1204-1205, citing *Press-Enterprise I*, at p. 513.)

Two years later, in *Press-Enterprise Co. v. Superior Court* (1986) 478 U.S. 1, 4-5 (*Press-Enterprise II*), the Supreme Court considered a constitutional challenge to a closure order involving a 41-day preliminary hearing.  Under Penal Code section 868 (authorizing exclusion of the public for the protection of a defendant's right to a fair trial), the court closed the hearing and thereafter sealed the hearing transcripts.  Our high court summarized the Supreme Court's decision as follows:  "Chief Justice Burger's seven-to-two opinion for the court first addressed the 'two complementary considerations' of (i) history—i.e., whether there is a 'tradition of accessibility' concerning preliminary hearings, and (ii) utility—i.e., whether 'public access plays a significant positive role in the functioning of [preliminary hearings].'  [Citation.] . . . [T]he court found a 'near uniform' practice of open preliminary hearings in this country from the 19th century to the present.  [Citation.]  Turning to the utility question, the court found that access to preliminary hearings 'plays a particularly significant positive role in the actual functioning of the process' [citation], because the preliminary hearing is 'often the final and most important step in the criminal proceeding' and in many cases provides ' "the sole occasion for public observation of the criminal justice system," ' and because closure frustrates the ' "community therapeutic value" of openness.' [Citation.  ¶]  The

18

[Supreme Court] concluded that preliminary hearings 'are sufficiently like a trial' so as to justify the same treatment under the First Amendment. [Citation.]" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1206, citing and quoting *Press-Enterprise II*, at pp. 8, 10-12.)[16]

Our high court conceded that the Supreme Court cases it reviewed had involved criminal proceedings. (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1207; see also *Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1303 [all of the Supreme Court cases detailed in *NBC Subsidiary* "arose in the criminal context, and the [Supreme C]ourt has not expressly extended its First Amendment right-of-access jurisprudence in those cases to any other context"].) But it noted the reasoning found in those cases "suggest[ed] that the First Amendment right of access extends beyond the context of criminal proceedings and encompasses civil proceedings as well. [Citations.]" (*NBC Subsidiary*, at p. 1207.) In addition, the high court noted dicta from two Supreme Court opinions suggesting that the right of access applied to civil cases. (*Id.* at pp. 1207-1208, citing *Richmond Newspapers*, *supra*, 448 U.S. at p. 580, fn. 17 (lead opn. of Burger, C.

---

[16] The high court in *NBC Subsidiary* also discussed two other Supreme Court cases involving the right of public access in criminal cases. In *Globe Newspaper Co. v. Superior Court* (1982) 457 U.S. 596 (*Globe*), the Supreme Court struck down a state law requiring courtroom closure in criminal trials during the testimony of minor victims. "Justice Brennan's opinion for a majority of the court, granting relief to the newspaper that challenged the statute, reiterated that 'to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that [the] constitutionally protected "discussion of governmental affairs" is an informed one.' [Citation.]" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1202, quoting *Globe*, at pp. 604-605.) In *Waller v. Georgia* (1984) 467 U.S. 39, 41-43 (*Waller*), the trial court granted the prosecution's request to close a lengthy suppression hearing, over the defendant's objection that such closure violated his Sixth Amendment right to a public trial. As summarized by the *NBC Subsidiary* court, the Supreme Court "held that the blanket closure order was overbroad and violated the defendant's right to a public trial [citation], and it announced that the standard for reviewing closure under the Sixth Amendment was the same as the standard for reviewing closure under the First Amendment as 'set out in *Press-Enterprise* [*I*] and its predecessors.' [Citation.]" (*NBC Subsidiary*, at p. 1205, fn. omitted, quoting *Waller*, at p. 47.)

19

J.) ["historically both civil and criminal trials have been presumptively open"]; and *Gannett Co., Inc. v. DePasquale* (1979) 443 U.S. 368, 386-387, fn. 15 ["[T]here is no principled basis upon which a public right of access to judicial proceedings can be limited to criminal cases . . . . [ ] Indeed, many of the advantages of public criminal trials are equally applicable in the civil trial context. . . . Thus, in some civil cases the public interest in access, and the salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases."].) After citing four federal and two state appellate decisions supporting such an extension (*NBC Subsidiary*, at p. 1208) and observing that there were no cases holding or even suggesting that the right did "not apply, as a general matter, to ordinary civil proceedings" (*id.* at p. 1209), the high court upheld the media's constitutional challenge. "We conclude, in light of [Supreme Court] case law and its progeny, that, in general, the First Amendment provides a right of access to ordinary civil trials and proceedings, that constitutional standards governing closure of trial proceedings apply in the civil setting, and that [Code of Civil Procedure] section 124 must, accordingly, be interpreted in a manner compatible with those standards." (*Id.* at p. 1212, fn. omitted; see also *H.B. Fuller v. Doe* (2007) 151 Cal.App.4th 879, 887.)

Therefore, our high court held, "it is clear today that substantive courtroom proceedings in ordinary civil cases are 'presumptively open' and that [Code of Civil Procedure] section 124 must be interpreted to preclude closure of proceedings that satisfy the high court's historical tradition/utility considerations—unless two things occur. [¶] First, a trial court must provide notice to the public of the contemplated closure. . . . [¶] Second, *before* substantive courtroom proceedings are closed or transcripts are ordered sealed, a trial court must hold a hearing and expressly find that (i) there exists an overriding interest supporting closure and/or sealing; (ii) there is a substantial probability that the interest will be prejudiced absent closure and/or sealing; (iii) the proposed closure and/or sealing is narrowly tailored to serve the overriding interest; and (iv) there

20

is no less restrictive means of achieving the overriding interest." (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1217, fns. omitted.)[17]

In holding that the First Amendment qualified right of public access applied to "ordinary civil trials and proceedings" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1212), the court emphasized that its decision was a limited one: "We address herein the right of access to ordinary civil proceedings in general, and not any right of access to particular proceedings governed by specific statutes." (*Id.* at p. 1213, fn. 30.)

B.      *Constitutional Right of Access to LPS Jury Trials*

Seven years after deciding *NBC Subsidiary*, our high court reiterated that "[a]lthough we so extended th[e Supreme Court's right of access] jurisprudence in *NBC Subsidiary*, we expressly limited the extension 'to *ordinary* civil proceedings in general,' and stressed that we were not addressing 'any right of access to particular proceedings governed by specific statutes.' [Citation.]" (*Copley Press, Inc. v. Superior Court, supra,* 39 Cal.4th at p. 1303, quoting *NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1212, fn. 30, original italics.)  Therefore, our constitutional analysis begins with a determination of whether court proceedings under the LPS Act, including jury trials, are "ordinary civil proceedings" to which the First Amendment right of public access applies.  (*NBC Subsidiary*, *supra*, 20 Cal.4th, at p. 1212, fn. 30.)  We will answer this question in the negative.

---

[17] As the above quote denotes, the qualified right of access includes both access to proceedings and court records.  The high court observed in a footnote that there is " a First Amendment right of access to civil litigation documents filed in court as a basis for adjudication . . . [¶] . . . [but] the First Amendment does not compel public access to discovery materials that are neither used at trial nor submitted as a basis for adjudication. [Citations.]" (*NBC Subsidiary*, *supra*, 20 Cal.4th at pp. 1208-1209, fn. 25.)  This footnote served as the basis for the adoption by the Judicial Council in 2001 of rules 2.550 and 2.551 of the California Rules of Court concerning the sealing of trial court records.  (See *Mercury Interactive Corp. v. Klein*, *supra*, 158 Cal.App.4th at pp. 68, 83-85.)

Because our high court in *NBC Subsidiary* expressly declined to address whether a constitutional right of access applies to "particular proceedings governed by specific statutes" (*NBC Subsidiary, supra*, 20 Cal.4th at p. 1212, fn. 30)—which we find to include LPS proceedings—we will determine if the particular proceedings here are ones that are required to be public. In doing so, we will apply the two-part inquiry adopted in *NBC Subsidiary*, asking whether LPS trials satisfy the "historical tradition/utility considerations" that would warrant a presumptive right of public access. (*NBC Subsidiary, supra*, 20 Cal.4th at p. 1217; see *In re Marriage of Burkle* (2006) 135 Cal.App.4th 1045, 1055-1061 [holding presumptive right of access applies to divorce proceedings based upon "historical tradition/utility considerations"]; *San Bernardino County Dept. of Public Social Services v. Superior Court* (1991) 232 Cal.App.3d 188, 197-205 [public access to juvenile dependency proceedings may serve positive function, but because there is no tradition of access, First Amendment right of access does not apply] (*San Bernardino County DPSS*).)

### 1. *LPS Jury Trial Is Not an "Ordinary" Civil Proceeding*

Our high court did not define "ordinary" in the context of its application of the right of access to "ordinary civil proceedings." (*NBC Subsidiary, supra*, 20 Cal.4th at p. 1212, fn. 30.) But it appears that a trial to determine whether a person is gravely disabled and thus warrants the person's commitment under the LPS Act is a "special proceeding" that is a creature of statute, rather than an "ordinary civil proceeding[]." In *Conservatorship of Martha P.* (2004) 117 Cal.App.4th 857, 860, the court considered whether a public conservator may dismiss or withdraw a petition for the reestablishment of an LPS Act conservatorship under Code of Civil Procedure section 581, subdivision (b)(1), under which an action may be dismissed with or without prejudice at the plaintiff's request before the actual commencement of trial. The court noted that "action," pursuant to Code of Civil Procedure section 581, subdivision (a)(1), is defined as " 'any civil action or special proceeding.' " (*Conservatorship of Martha P.*, at p. 866.)

22

It concluded that the dismissal provisions of Code of Civil Procedure section 581, subdivision (b)(1) applied, because "an involuntary commitment or recommitment proceeding under the LPS Act is a 'special proceeding' [citation]." (*Conservatorship of Martha P.*, at p. 867; see also *Bagration v. Superior Court* (2003) 110 Cal.App.4th 1677, 1685, fn. 7 [LPS Act conservatorship proceedings for gravely disabled persons are special proceedings].)

In *People v. Yartz* (2005) 37 Cal.4th 529, 532 (*Yartz*), our high court addressed whether a prior plea of nolo contendere to a child molestation offense could be used to find the defendant to be a sexually violent predator (SVP) under section 6600 et seq., the Sexually Violent Predators Act (SVPA). The resolution of this issue turned on whether (as defendant claimed), an SVP proceeding was a "civil suit" for purposes of Penal Code section 1016, former subdivision (3), which read in part: " 'The legal effect of [a nolo contendere] plea shall be the same as that of a plea of guilty, but the plea and any admission required by the court during any inquiry it makes as to the voluntariness of and factual basis for the plea *may not be used against the defendant as a admission in any civil suit based upon or growing out of the act upon which the criminal prosecution is based.*' [Citation.]" (*Yartz*, at p. 534, original italics.) The high court reviewed the nature of SVP proceedings generally, and observed that "[t]he SVPA is not punitive in purpose and effect." (*Id.* at p. 535.) It noted that "[s]ince 1872, judicial remedies have been divided into two classes: actions and special proceedings. (Code Civ. Proc., § 21.) An 'action' is defined [under Code of Civil Procedure section 22] as 'an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense.' [Citations.] A 'special proceeding' [under Code of Civil Procedure section 22] is '[e]very other remedy' that is not an 'action.' [Citations.]"

23

(*Id.* at p. 536.)[18]  Our high court, in rejecting the defendant's argument that Penal Code section 1016, former subdivision (3), barred the use of his nolo contendere plea in the SVP proceeding because it constituted a "civil suit," concluded that " 'an SVPA commitment proceeding is a special proceeding of a civil nature, because it is neither an action at law nor a suit in equity, but instead is a civil commitment proceeding commenced by petition independently of a pending action.' [Citation.]" (*Yartz*, at pp. 536-537.)

Under *Yartz*, *supra*, 37 Cal.4th at page 536—although the statutory criteria for civil commitment obviously differ significantly as between the SVPA and the LPS Act— there can be no meaningful distinction between the two proceedings in terms of their classification because (1) neither is a proceeding with the purpose or effect of imposing punishment on the individual (*Yartz*, at p. 535; *Conservatorship of Ben C.*, *supra*, 40 Cal.4th at p. 543 ["LPS commitment ' "may not reasonably be deemed punishment either in its design or purpose" ' "]); and (2) both are " 'special proceeding[s] of a civil nature . . . [and are] civil commitment proceeding[s] commenced by petition independently of a pending action.' [Citation.]" (*Yartz*, at pp. 536-537; see also *Conservatorship of Martha P.*, *supra*, 117 Cal.App.4th at p. 867.)

We therefore conclude that a jury trial under the LPS Act is not an "ordinary civil proceeding[]" as to which a qualified First Amendment public right of access applies.

> 2.     *History and Utility Does Not Suggest Right of Access*

*NBC Subsidiary* was concerned with public access to an "ordinary" civil trial, not the kind of special proceedings here:  a jury trial to determine whether a person should be involuntarily committed as gravely disabled under the LPS Act.  (Cf. *In re Marriage of*

---

[18] "As a general rule, a special proceeding is confined to the type of case which was not, under the common law or equity practice, either an action at law or a suit in equity." (*Tide Water Assoc. Oil Co. v. Superior Court* (1955) 43 Cal.2d 815, 822.)

*Burkle*, *supra*, 135 Cal.App.4th at p. 1055 [*NBC Subsidiary* "simply did not address" whether divorce proceedings are "among the ordinary civil proceedings that are presumptively open"].)  Consistently with the high court's approach—which in turn was founded upon the Supreme Court's reasoning in cases such as *Richmond Newspapers, supra*, 448 U.S. 555 and *Press-Enterprise II*, *supra*, 478 U.S. 1—we will examine the "historical tradition/utility considerations" of LPS jury trials to determine whether, as special proceedings, they are presumptively open.  (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1217.)

a.     *Historical Tradition*

There is little helpful data concerning whether LPS trials have a tradition of openness.  The People concede this point:  "Whether a[n] LPS jury trial has historically been open is unclear.  There appears to be no reported case on this subject."  We likewise have found no reported cases addressing the issue.  Additionally, our examination of the local superior court rules of numerous counties of the state has not been illuminative.[19]

One practice guide describes the uneven approach afforded confidentiality under the LPS Act in California trial courts:  "Confidentiality is a significant issue in all LPS conservatorship proceedings.  In at least one county, the entire file is confidential, the court calendar is not available to the public, family members can receive notice of the hearing only if the patient consents and can attend the hearing only at the patient's request.  In some counties, the court investigator's report and doctor's declarations are

---

[19] Very few counties have promulgated any local rules concerning LPS proceedings.  Approximately 10 percent of the 58 counties in the state (one having no local rules at all) have promulgated local rules directed specifically at LPS proceedings. Although several courts have rules indicating that *Riese* (*Riese v. St. Mary's Hosp. & Med. Ctr.* (1987) 209 Cal.App.3d 1303 (*Riese*)) medication capacity hearings are to be conducted in a confidential setting (see, e.g., Super. Ct. LA County, Local Rules, rule 8.51(e); Super. Ct. San Diego County, Local Rules, rules 8.5.8, 8.5.15; Super. Ct. Tulare County, Local Rules, rules 1050, 1057), we found no rules that provide generally that hearings or trials under the LPS Act are nonpublic, or for that matter, public.

confidential, but the petition and calendar are available to the public, although the court may close the hearing. In other counties, the report and declaration are confidential, and the matter is heard in open court unless it is a contested hearing, which will be closed to the general public. In still other counties, even contested hearings are open to the public, unless good cause is shown to close them on request." (2 Cal. Conservatorship Practice (Cont.Ed.Bar 2012), Conservatorships for the Gravely Disabled Under the LPS Act, § 23.47, pp. 1340-1341.)

There are elements of the statutory scheme that suggest the absence of a tradition of openness in LPS proceedings. For example, section 5118 provides that "[n]otwithstanding any other provisions of this section, any party to the proceeding may demand that the hearing be public, and be held in a place suitable for attendance by the public." This language suggests that, as a general rule, LPS conservatorship proceedings are nonpublic in nature. Therefore, regardless of whether this provision, as Sorenson argues, applies to LPS conservatorship jury trials (see discussion at pt. VI.C., *post*), it is some evidence that conservatorship proceedings are not presumptively open. In addition, certain provisions of the LPS Act safeguard the privacy rights of the proposed conservatee and provide for the confidentiality of records generated in his or her treatment. Most notably, section 5328 provides in part that "[a]ll information and records obtained in the course of providing services under . . . Division 5 (commencing with Section 5000) . . . to either voluntary or involuntary recipients of services shall be confidential." (See also § 5330 [providing for damages action for willful violation of confidentiality provisions of LPS Act]; see also Cal. Judges Benchguides, Benchguide 120: LPS Proceedings (CJER 2010), § 120.32, p. 120-22 ["unauthorized disclosure [of information made confidential under § 5328] may result in substantial civil penalties"].) Further, "the LPS Act 'specifies a nonexclusive list of rights including "[a] right to dignity, privacy, and humane care" (§ 5325.1, subd. (b)) . . .' " (*In re Qawi* (2004) 32 Cal.4th 1, 17, quoting *Riese*, supra, 209 Cal.App.3d at p. 1314.) And a court-ordered

26

evaluation under the LPS Act is "to be carried out with the utmost consideration for the privacy and dignity of the [proposed LPS conservatee]." (§ 5200.)

These statutes militate against finding a tradition of openness of LPS court proceedings, to the extent they (1) may be construed to require that hearings be nonpublic, absent a "demand that the hearing be public" (§ 5118); (2) require that the privacy rights of proposed conservatees be given the utmost respect; and (3) preserve the confidentiality of medical and other records relating to proposed conservatees' care and treatment. Absent a contrary showing, therefore, we conclude that the first element of "historical tradition" does not favor a right of access.

b. *Utility Considerations*

The element of utility relevant to determining a right of public access to conservatorship proceedings and court records is likewise difficult to evaluate. As a general matter, the Supreme Court has identified the utility of open trials in the criminal context as consisting of the factors of (1) the "enhance[ment of] the performance and accuracy of trial proceedings[; 2] educat[ion of] the public, [3] perform[ing] a 'therapeutic' value to the community" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1200, citing *Richmond Newspapers*, *supra*, 448 U.S. at pp. 569-573 [lead opn.]); (4) "provid[ing] a means . . . by which citizens scrutinize and 'check' the use and possible abuse of judicial power [citation;]. . . [and, related to the first attribute, 5] serv[ing] to enhance the truth-finding function of the proceeding [citation]." (*NBC Subsidiary*, at p. 1202, citing *Richmond Newspapers*, 448 U.S. at pp. 596-597 [Brennan, J., conc. opn.].)

The first and fifth beneficial factors—enhancing the conduct, accuracy, and truth-finding function of trials (*NBC Subsidiary*, *supra*, 20 Cal.4th at pp. 1200, 1202)—are not as significant in LPS proceedings as in criminal and ordinary civil proceedings. LPS proceedings generally concern private issues relating to the proposed conservatee's mental health. (See *People v. Dixon* (2007) 148 Cal.App.4th 414, 427-428 [because involuntary civil commitment "proceedings are aimed at determining the status of a

27

person's mental health, they involve primarily personal and confidential matters"].)
While there are undoubtedly instances in which there will be contested lay or expert testimony in connection with proceedings to determine, inter alia, whether the proposed conservatee is gravely disabled, many LPS proceedings do not have the character of criminal or civil trials in which public scrutiny will significantly enhance the truth-finding process. (Cf. *San Bernardino County DPSS*, *supra*, 232 Cal.App.3d at p. 202 [open juvenile proceedings may be beneficial in discouraging perjury and encouraging witnesses to come forward].)

The second factor—"educat[ion of] the public" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1200)—undoubtedly applies to LPS proceedings. Access to LPS conservatorship proceedings would be beneficial, to the extent that it would inform members of the public of ongoing mental health issues in their communities. But too much can be made of this factor because "education of the public" is a mantra that may be readily invoked in support of access to *any* court proceeding. As Justice Brennan observed: "[B]ecause 'the stretch of this protection [of a First Amendment "right of access"] is theoretically endless' [citation], it must be invoked with discrimination and temperance. For so far as the participating citizen's need for information is concerned, '[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.' [Citation.]" (*Richmond Newspapers*, *supra*, 448 U.S. at p. 588 [Brennan, J., conc. opn.].)

The third factor—"perform[ing] a 'therapeutic' value to the community" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1200)—offers little support for the position that there should be public access to LPS conservatorship proceedings. As described by the Supreme Court, the " 'therapeutic' " function of public proceedings is relevant where societal reaction, including outrage, exists in response to the commission of crimes: "This openness has what is sometimes described as a 'community therapeutic value.' Criminal acts, especially violent crimes, often provoke public concern, even outrage and

hostility; this in turn generates a community urge to retaliate and desire to have justice done. . . . When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions. Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected." (*Press-Enterprise I*, *supra*, 464 U.S. at pp. 508-509.) While one of the goals of LPS conservatorship proceedings is the protection of the public (§ 5001, subd. (c); *Conservatorship of John L.*, *supra*, 48 Cal.4th at p. 150), the " 'therapeutic' value" that public proceedings present to ensure that persons committing criminal acts are brought to justice has no application to proceedings determining whether a person is gravely disabled.

The fourth factor—"provid[ing] a means . . . by which citizens scrutinize and 'check' the use and possible abuse of judicial power" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1202)—applies to LPS conservatorship proceedings. (Cf. *San Bernardino County DPSS*, *supra*, 232 Cal.App.3d at p. 202 [access to juvenile dependency proceedings "may also serve to check judicial abuse"].) But this factor—as is true with the public education factor—has seemingly limitless application to *any* judicial proceeding. Furthermore, to the extent that section 5118 permits "any party to the proceeding [to] demand that the hearing be public," it serves as a form of escape valve, permitting a party to allow the public to " 'check' the use and abuse of judicial power" (*NBC Subsidiary*, at p. 1202) by requiring open proceedings. Therefore, we find that the fact that access to LPS proceedings may serve as a theoretical " 'check' [with respect to] the use and possible abuse of judicial power" (*ibid.*), of itself, is insufficient to support a conclusion that there is a constitutional right to public access of special proceedings such as LPS conservatorships.

In sum, the utility of open LPS conservatorship proceedings is far less than the utility of having criminal proceedings or ordinary civil proceedings open to the public. This finding, coupled with the absence of a showing of a "historical tradition" of public access, leads us to conclude that there is no constitutional right of public access to LPS proceedings, including trials. (Cf. *In re Marriage of Burkle*, *supra*, 135 Cal.App.4th at pp. 1056-1057 [First Amendment right of access applies to divorce proceedings, where benefits of open civil trials generally applied to divorce proceedings and there was no showing they were traditionally closed].)[20]

### C. *Applicability of Code of Civil Procedure Section 124*

Our conclusion that public access to LPS conservatorship proceedings is not constitutionally mandated does not end our inquiry. We must determine whether there is a statutory exception to Code of Civil Procedure section 124—"California's long-

---

[20] Proposition 59, effective November 3, 2004, which amended the California Constitution to specifically provide for "the people's right of access to information in public settings" (*Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588, 597)— and which was cited by the media below—does not compel a different conclusion. "The people have the right of access to information concerning the conduct of the people's business, and, therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny." (Cal. Const., Art. I, § 3, subd. (b)(1).) Notwithstanding its provision (under section 3, subdivision (b)(2)) "expressly provid[ing] for the broad construction of statutes furthering the people's right of access to information concerning the conduct of the people's business, the amendment specifically provided [in subdivision (b)(3)] that it did not modify the constitutional right of privacy or affect the construction of any statute protecting the right to privacy." (*In re Marriage of Burkle*, *supra*, 135 Cal.App.4th at p. 1059, fn. omitted.) Likewise, the amendment expressly provided that it did "not repeal or nullify, expressly or by implication, any constitutional or statutory exception to the right of access to public records or meetings of public bodies" then in effect. (Cal. Const., Art. I, § 3, subd. (b)(5).) Since we have concluded that no qualified First Amendment right of public access exists with respect to LPS proceedings, and because we conclude, *post*, that section 5118, which predated Proposition 59, is a specific statutory exception to Code of Civil Procedure section 124's requirement that courtroom proceedings be open, Article I, section 3, subdivision (b) of the California Constitution does not establish independently a right of public access to LPS proceedings.

30

standing 'open-court' statute" (*NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1181)—which would negate its requirement that LPS proceedings be open to the public.  Under Code of Civil Procedure section 124, court proceedings "shall be public," "[e]xcept as provided in section 214 of the Family Code[21] or any other provision of law."  Sorenson argues that section 5118 is such a statutory exception.  He contends that it creates a presumption that LPS proceedings are nonpublic, because it provides that any party to them may demand that a "hearing" (which he contends includes a trial) be public.  The People respond[22] that section 5118—based upon its language and legislative history—may not be construed as providing for nonpublic LPS trials, and therefore such trials are public under Code of Civil Procedure section 124.

A resolution of this controversy requires that we employ the customary rules of statutory interpretation.  " 'We begin by examining the words of the [statute]; if the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs.  [Citations.]' " (*People v. Montes* (2003) 31 Cal.4th 350, 356, quoting *People v. Walker* (2002) 29 Cal.4th 577, 581.)  When there are statutory ambiguities, we may "examin[e] the context in which the language appears and adopt[] the construction which best serves to harmonize the statute internally and with related statutes." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871.)  " 'When the language

---

[21] "Except as otherwise provided in this code or by court rule, the court may, when it considers it necessary in the interests of justice and the persons involved, direct the trial of any issue of fact joined in a proceeding under this code to be private, and may exclude all persons except the officers of the court, the parties, their witnesses, and counsel." (Fam. Code, § 214.)

[22] In its opposition to the motion to dismiss, The Herald does not directly address Sorenson's claim that section 5118 requires that LPS proceedings be nonpublic, unless a party demands otherwise.  But The Herald does refer to the People's argument that there is nothing in the LPS Act that "explicitly requires . . . secrecy" of LPS proceedings.  And it argued below that section 5118 does not require that LPS proceedings in general be nonpublic.

is susceptible of more than one reasonable interpretation, . . . we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]' [Citation.]" (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744.) "Using these extrinsic aids, we 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " (*People v. Sinohui* (2002) 28 Cal.4th 205, 211-212.)

Following this approach, first, we " 'scrutinize the actual words of the statute [section 5118], giving them a plain and commonsense meaning. [Citations.]' [Citation.]" (*Garcia v. McCutcheon* (1997) 16 Cal.4th 469, 476.) If we find this step inconclusive, we then look to the legislative history of section 5118. If we are unable to resolve the controversy from doing so, we examine other provisions of the LPS Act in an effort to harmonize them with the language of section 5118 in construing the statute. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 (*Moyer*): "[T]he various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.") After considering section 5118 in the overall context of the LPS Act, and taking into consideration additional rights of patient privacy, we will conclude that LPS proceedings, including jury trials, are presumptively nonpublic under section 5118.

### 1. *The Language of Section 5118*

The relevant portion of section 5118 reads: "Notwithstanding any other provisions of this section, any party to the proceeding may demand that the hearing be

32

public, and be held in a place suitable for attendance by the public."**23** The term "the hearing" in the previously quoted sentence refers to any hearing under the LPS Act. This is true for at least two reasons. First, the initial language of section 5118 refers to ". . . conducting hearings under this part, . . .", and part 1 of Division 5 of the Welfare and Institutions Code embraces the LPS Act in its entirety. Second, the last paragraph of the statute expresses its all-inclusiveness: "As used in this section, a 'hearing under this part' includes conservatorship and other hearings held pursuant to Chapter 3 (commencing with Section 5350) of this part."

The more difficult question is whether "the hearing," in the context of "any party to the proceeding may demand that the hearing be public" (§ 5118), includes LPS court trials and jury trials. One view, as argued by the People, is that the term "the hearing," as used in section 5118, cannot be construed as including a formal trial. They claim that the phrase "jury trial" appears nowhere in section 5118, and that its absence is "telling." The People assert that had the Legislature intended to make LPS jury trials presumptively

---

**23** The full text of section 5118 provides: "For the purpose of conducting hearings under this part, the court in and for the county where the petition is filed may be convened at any time and place within or outside the county suitable to the mental and physical health of the patient, and receive evidence both oral and written, and render decisions, except that the time and place for hearing shall not be different from the time and place for the trial of civil actions for such court if any party to the proceeding, prior to the hearing, objects to the different time or place. [¶] Hearings conducted at any state hospital or any mental health facility designated by any county as a treatment facility under this part or any facility referred to in Section 5358 or Division 7 (commencing with Section 7100), within or outside the county, shall be deemed to be hearings held in a place for the trial of civil actions and in a regular courtroom of the court. [¶] Notwithstanding any other provisions of this section, any party to the proceeding may demand that the hearing be public, and be held in a place suitable for attendance by the public. [¶] Notwithstanding any other provisions of law, any hearing under this part which was held before enactment of this section but which would have been in accordance with this section had it been effective is deemed to be valid for all purposes. [¶] As used in this section, a 'hearing under this part' includes conservatorship and other hearings held pursuant to Chapter 3 (commencing with Section 5350) of this part."

33

nonpublic, it could have readily done so by using the precise term. They argue further that section 5118 is inapplicable to jury trials because a hearing is a proceeding different from, and often containing less formality than, a trial.[24]

The People rely on *Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953 (*Joseph W.*) in arguing that LPS jury trials are not presumptively nonpublic under section 5118. There, after the conservatee made a request for a " 'hearing' " on a petition to reestablish LPS conservatorship (*id.* at p. 959), the court conducted a bench trial and reestablished the conservatorship; the conservatee then demanded a jury trial pursuant to section 5350, subdivision (d). (*Joseph W.*, at pp. 959-960.) The court denied the request, concluding the conservatee had previously requested and received a court trial. (*Id.* at p. 960.)

The appellate court in *Joseph W.* held that the trial court erred in interpreting the conservatee's initial request for a hearing as a request for a court trial. In so concluding, the court interpreted two code sections: (1) section 5362, subdivision (b), under which the court may dispose of a petition to reestablish conservatorship on its own motion, "[s]ubject to a request for a court hearing or jury trial"; and (2) section 5350, subdivision (d), under which a patient may demand a court or jury trial on the question of grave disability in connection with petitions to establish or reestablish an LPS conservatorship, and may make such demand either "within five days following the hearing on the conservatorship petition," or "before the date of the hearing." (*Joseph W.*, *supra*, 199 Cal.App.4th at p. 963-966.) It held that, "the terms 'hearing' in section 5350, subdivision (d), and 'court hearing' in section 5362, subdivision (b), have the same meaning. In the

---

**24** We observe that, in urging that a hearing is distinct from a trial because of the relative lack of formality of the former, the People cite a 1979 version of Black's Law Dictionary. (See Black's Law Dict. (5th ed. 1979), p. 649.) Later editions, including the current edition, do not contain such a definition supporting the People's position. (See, e.g., Black's Law Dict. (9th ed. 2009), p. 788, col. 1.)

34

context of those statutes, 'hearing' and 'court hearing' have the meaning of a summary-type proceeding short of a 'trial.' " (*Id.* at p. 965.)  The court therefore held that a "conservatee may first request a hearing on a reestablishment petition and subsequently . . . may demand a court or jury trial on the issue of whether he or she is gravely disabled under the LPS Act.  Alternatively, a conservatee may object to a reestablishment petition and demand a court or jury trial, without first requesting an initial hearing on the petition, and thereby waive his or her right to that hearing." (*Ibid.*)

*Joseph W.*, *supra*, 199 Cal.App.4th 953 does not cause us to conclude that the plain meaning of "the hearing" in section 5118 is one that excludes LPS jury trials.  The court there was construing the somewhat ambiguous phrase in section 5362, subdivision (b), "[s]ubject to a request for a court hearing or jury trial," in determining whether "court hearing" was synonymous with "court trial" in the context of the LPS Act's proceedings, both informal and formal, on petitions for reestablishment of conservatorships.  Here, we interpret a different statute, section 5118, and are concerned with whether "the hearing" that "any party . . . may demand . . . be public" includes LPS court trials and jury trials.  This is an entirely different issue from the one presented in *Joseph W.*  (See *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680 [cases are not authority for propositions not considered].)  And as the court in *Joseph W.* acknowledged, "the meanings of the terms 'trial' and 'hearing' can vary depending on the particular context in which they are used and can, in certain circumstances, overlap.  [Citations.]" (*Joseph W.*, at p. 966.)[25]

---

[25] For example, in the context of criminal proceedings, where a defendant's motion to suppress evidence "is granted pursuant to the proceedings authorized by [Section 1538.5], the property or evidence shall not be admissible against the movant *at any trial or other hearing* unless further proceedings authorized by [Section 1538.5], Section 871.5, 1238, or 1466 are utilized by the people." (Pen. Code, § 1538.5, subd. (d), italics added.)  One would infer from the italicized language "at any trial or other hearing" that, at least in this context, the Legislature considered a trial to be one form of a "hearing."

On the other hand, there is nothing on the face of section 5118 itself that suggests that the term "the hearing" includes jury trials. We are mindful that our task in " 'seek[ing] the meaning of a statute is not simply to look up dictionary definitions and then stitch together the results. Rather, it is to discern the sense of the statute, and therefore its words, in the legal and broader culture.' " (*Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114.) Since the language of section 5118 does not permit us to determine whether jury trials are nonpublic, we will look to extrinsic sources, including legislative history and the context of the LPS Act in which section 5118 is found, in an effort to resolve the question.

2.  *Legislative History of Section 5118*

The People argue that the legislative history of section 5118 does not support the view that LPS jury trials are presumptively nonpublic. Rather, they contend, section 5118—adopted two years after section 5350, under which the proposed conservatee is afforded the right to a jury trial—makes no mention of jury trials and "was added to allow for a superior court to hold hearings under the LPS [Act] at any place suitable to the mental and physical condition of the patient." They argue that because there is nothing in the legislative history indicating that the statute would apply to jury trials, section 5118 should not be so construed.

The legislative history materials submitted to the court below do not assist us in determining

whether the Legislature intended the language in section 5118—that "any party to the proceeding may demand that the hearing be public"—to include jury trials.[26] While

---

[26] The Herald submitted the legislative history materials concerning section 5118 as part of a request for judicial notice pursuant to Evidence Code section 452, subdivision (c). Although the court below referred to these materials in its order, it did not specifically rule on The Herald's request. We will treat the People's argument here, in which it specifically refers to the legislative history materials submitted below, as an implied request for judicial notice (see *McGill v. Superior Court* (2011) 195 Cal.App.4th

36

the materials contain no specific reference to "jury trials" and disclose that the legislation may have been enacted, in part, to allow for LPS hearings to be conducted outside of a courtroom at a location suitable to the patient, they do not convince us that the term "the hearing" in the above-quoted passage of section 5118 was intended to exclude jury trials. (See *Garcia v. County of Sacramento* (2002) 103 Cal.App.4th 67, 74: " 'The significance to be accorded extrinsic evidence of legislative intention . . . depends upon its capacity to resolve ambiguities in statutory language.' ") We conclude that the legislative history of section 5118 is not dispositive.

### 3. *Section 5118 in the Context of The LPS Act*

As we have concluded, the issue of whether section 5118 should be construed as making LPS jury trials presumptively nonpublic is not readily resolvable from the language of the statute itself or from its legislative history. We will therefore examine other relevant sections of the LPS Act to address the issue. (See *Moyer*, *supra*, 10 Cal.3d at p. 230.) In placing section 5118 in the context of the LPS Act (*Moyer*, at p. 230), we specifically consider other sections that refer to hearings or trials, and other statutes that address confidentiality concerns.

### a. *LPS Act Hearings and Trials*

There are several types of hearings specified under the LPS Act. Some are in the nature of administrative hearings before nonjudicial officers. For example, the Act provides for a "certification review hearing" to be held within four days after a person is certified for intensive treatment for up to 14 days under section 5250, or is recertified for additional treatment of up to 30 days under section 5270.15 (§ 5256). This hearing is held by a hearing officer with qualifications specified under section 5256.1; it is an informal hearing in which rules of evidence and procedure are inapplicable (§ 5256.4,

---

1454, 1490, fn. 19), and we will grant the request under Evidence Code section 459, subdivision (a).

37

subd. (b)). And if "judicial review has been requested [by requesting release through a writ of habeas corpus] as provided in Sections 5275 and 5276" (§ 5256), the court shall conduct "an evidentiary hearing" (§ 5276).

There are a variety of other "hearings" specifically described under the LPS Act. They include hearings (1) to determine whether medication should be administered involuntarily based upon a detained person's incapacity to refuse treatment (§ 5332); (2) to extend a temporary conservatorship beyond 30 days (§ 5352.1, subd. (b)); (3) concerning objections to a conservator's proposed transfer to a different facility of a conservatee who is a criminal defendant found incompetent to stand trial (§ 5358, subd. (d)(2)); (4) to contest proposed court orders sought by a conservator requiring the conservatee to receive medical treatment (§ 5358.2); (5) to contest rights denied a conservatee under section 5357 (§ 5358.3); (6) to contest powers granted to a conservator under section 5358 arising from petitions for the appointment of a temporary conservator (§ 5358.3); (7) on habeas corpus petitions by the conservatee challenging the placement or the conditions of his or her confinement (§ 5358.7); (8) on a conservator's petition to reestablish the conservatorship for an additional year (§ 5362); and (9) on the conservatee's continued status as a conservatee, pursuant to his or her request (§ 5364). While many of these hearings are judicial proceedings to which the label "trial" seems inapplicable, other proceedings in which the person is granted the right to a jury to decide the controversy may comfortably be labeled either as "hearings" or "trials." (See, e.g., §§ 5303 [proceedings on petitions for postcertification treatment]; 5352.1, subd. (c) [proceedings, at conservatee's request, for court or jury trial on grave disability question]; 5362 [proceedings on petition to reestablish conservatorship, at conservatee's request, before court or jury to determine whether grave disability still exists]; see also *Joseph W.*, *supra*, 199 Cal.App.4th at p. 965 [conservatee, under § 5362, subd. (b), may demand court trial or jury trial on grave disability question for reestablishment petition].)

38

Two specific provisions of the LPS Act convince us that a proper interpretation of the term "the hearing" under section 5118 is one that includes a court or jury trial. Under section 5303, the court must conduct the "proceedings" on a postcertification petition for further treatment of a person deemed to be imminently dangerous to others within four days of its filing, and the proceedings are to be conducted "in accordance with constitutional guarantees of due process of law and procedures required under Section 13 of Article I of the Constitution of the State of California." But "[i]f at the time of the hearing the person . . . requests a jury trial, such trial shall commence within 10 judicial days of the filing of the petition . . ." (§ 5303.) Thus, the postcertification proceeding is one that is heard by the court in a bench trial, or, if the person requests it, by a jury in a jury trial. There is no functional distinction between the two proceedings; the terms "hearing" and "trial" in section 5303 both mean a trial.

Secondly, under subdivision (a) of section 5362 (concerning petitions to reestablish conservatorships), the clerk is required to given written notice at least 60 days before termination of an LPS conservatorship. The notice required in subdivision (a) of section 5362 includes the following language: "Subject to a *request for a court hearing by jury trial* the judge may, on his or her motion, accept or reject the conservator's petition. [¶] If the conservator petitions to reestablish conservatorship . . . there shall be *a court hearing or a jury trial, whichever is requested*, on the issue of whether the conservatee is still gravely disabled and in need of a conservatorship." (Italics added.) This language in section 5362, subdivision (a) initially equates the term "court hearing" with "jury trial," and later equates a "court hearing" to a bench trial.

The various contexts under which the LPS Act calls for a "hearing," and the Act's interchangeable use of the words "hearing" and "trial," lead us to conclude that the presumptive nonpublic "hearing" language in section 5118 was intended to apply to court trials and jury trials, as well as to other hearings under the Act.

b.     *LPS Act Confidentiality*

39

As we will discuss, construing section 5118 as making all LPS proceedings—whether they are labeled "hearings" or "trials"—presumptively nonpublic is also consistent with the confidentiality of patient records as mandated under the LPS Act itself. It also comports with the broader context of a patient's constitutional right of privacy, and the protections afforded to patients under the psychotherapist-patient privilege.

As noted (see pt. VI.B.2.a., *ante*), section 5328 requires that "[a]ll information and records obtained in the course of providing services under" the LPS Act (among other statutes) be kept confidential. (See also § 5202 [screening report prepared in connection with petition for evaluation of person believed to be gravely disabled and submitted to court confidential and subject to provisions of § 5328].) While section 5328 contains specified exceptions, including disclosure "[t]o the courts, as necessary to the administration of justice" (§ 5328, subd. (f)), the statute is to be "strictly construed . . . [in] permitting release of information only under limited circumstances to limited government agencies." (*People v. Gardner* (1984) 151 Cal.App.3d 134, 140; see also *County of Riverside v. Superior Court* (1974) 42 Cal.App.3d 478, 481 ["one of the legislative purposes in providing for confidentiality was undoubtedly to encourage persons with mental or alcoholic problems to seek treatment on a voluntary basis"].) The safeguarding of the privacy rights of the proposed conservatee is also emphasized elsewhere in the LPS Act. (See, e.g., §§ 5200, 5325.1, subd. (b).) [27]

---

[27] The privacy protections of section 5325.1, subdivision (b) are frequently invoked by appellate courts in redacting the name of the LPS conservatee. (See, e.g., *Conservatorship of Susan T.*, *supra*, 8 Cal.4th at p. 1008, fn. 1; *People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1549, fn. 1; *Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 608, fn. 1.)

Sorenson argued below that LPS trial transcripts are confidential pursuant to section 5328. It is unclear whether he continues to assert that position here.[28] The People respond that the confidentiality provisions of section 5328 cannot be construed as applying to court transcripts because they are not "information and records obtained in the course of providing services." (§ 5328.) In support of this position, they cite an Opinion of the Attorney General. (See 53 Ops. Cal. Atty Gen. 25 (1970).) We agree with the People on this narrow point. The court transcripts from LPS conservatorship trials cannot reasonably be construed as constituting "records obtained in the course of providing services." (§ 5328.) But this begs the issue. That Attorney General Opinion only concerned whether the language of section 5328 renders court records nonpublic. It did not address whether conservatorship trials and the records derived from them are presumptively nonpublic under section 5118—nor could it have addressed that statute, since the opinion predated the enactment of section 5118. The fact that section 5328 makes confidential the information and records generated from services provided to the proposed LPS conservatee is relevant here because it gives context for our interpretation of the language in section 5118.

The People also argue that the term "the hearing" in section 5118 should be read narrowly because—in addition to the fact that the precise words "jury trials" were not used in the statute—there is no other language in the LPS Act expressly making LPS trials nonpublic. They correctly point out that section 5350, subdivision (d), under which the proposed conservatee is afforded the right to a jury trial, makes no mention of the fact that trials are to be closed to the public.[29] And the People correctly note that there are

---

[28] There is a suggestion in one of his briefs filed with this court that section 5328 provides an exception to Code of Civil Procedure section 124's requirement that "the sittings of every court shall be public."

[29] In their argument that the absence of language in section 5350 concerning closed LPS jury trials compels the conclusion that they are presumptively open to the public, the People refer to a large volume of legislative materials of which they have

other statutes outside the LPS Act in which the Legislature has more clearly provided for closed proceedings. (See, e.g., Fam. Code, § 7643, subd. (a) [paternity hearings or trials "may be held in closed court"]; Fam. Code, § 7643, subd. (b) [limited access to paternity court files]; Fam. Code, § 8611 [adoption hearings closed to public]; § 676, subd. (a) ["the public shall not be admitted to a juvenile court hearing" absent minor's request]; § 827 [access to juvenile case files limited to specified parties].) But crediting these arguments, we nonetheless believe that section 5118, when harmonized with other sections of the Act, requires a broader reading that promotes the privacy of the proposed LPS conservatee and the confidentiality of his or her records.

### c. *Psychotherapist-Patient Privilege*

In addition to the confidentiality language of section 5328, we consider the psychotherapist-patient privilege, which Sorenson asserted below. That privilege— which is "an aspect of the patient's constitutional right to privacy" under article I, section 1 of the California Constitution (*People v. Stritzinger* (1983) 34 Cal.3d 505, 511 (*Stritzinger*))—is codified under Evidence Code section 1014. It affords "the patient, whether or not a party, [the] privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . ." (*Ibid.*) At the time Evidence Code section 1014 was enacted (approximately two years before the LPS Act), it was observed: " 'Psychoanalysis and psychotherapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life . . . . Unless a patient . . . is assured that such information can and will be

---

requested this court to take judicial notice. These materials were not submitted to the court below. Since appellate courts ordinarily do not take judicial notice of records not presented to the lower court (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3), and the materials here are of little utility—since we are concerned with the interpretation of section 5118, not section 5350—the People's request for judicial notice is denied. (See *People v. McKinzie* (2012) 54 Cal.4th 1302, 1326 [court will take judicial notice of only relevant matter].)

held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment . . . depends.' [Citation.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 555, quoting Sen. Judiciary Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1014, p. 621.) Therefore, because "an environment of confidentiality of treatment is vitally important to the successful operation of psychotherapy" (*In re Lifschutz* (1970) 2 Cal.3d 415, 422; see also *Jaffee v. Redmond* (1996) 518 U.S. 1, 10), the "privilege has been broadly construed in favor of the patient." (*Stritzinger*, at p. 511; see also *In re Lifschutz,* at p. 435, fn. 20 ["the Legislature acknowledged that the unique nature of psychotherapeutic treatment required and justified a greater degree of confidentiality than was legally afforded other medical treatment"]; *Story v. Superior Court* (2003) 109 Cal.App.4th 1007, 1014 [public policy dictates that privilege be construed broadly in favor of patient and exceptions to privilege be construed narrowly].)[30]

It is true that the confidentiality provisions of section 5328 operate independently of the psychotherapist-patient privilege. (Simons, California Evidence Manual (2013) Privileges § 5:44, p. 391; see also *People v. Pack* (1988) 201 Cal.App.3d 679, 685, disapproved on another ground in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123, 1128.) Indeed, section 5328 may afford broader protection than the psychotherapist-patient privilege. For example, the mere fact of the patient's entry into a facility for treatment may be subject to the confidentiality provisions of section 5328, but it may not be protected under Evidence Code section 1014. (See *In re S.W.* (1978) 79

---

[30] We note that there are additional statutory schemes affording privacy protection to patients that serve as further justification for concluding that LPS proceedings, with their attendant disclosure of mental health records and findings, are nonpublic. (See, e.g., the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub.L. 104-191, 110 Stat. 1936, and specifically Section 264 of HIPAA, 42 U.S.C. § 1320d-2 Note [directing Secretary of Health and Human Services to promulgate regulations to protect privacy of medical records], and 45 C.F.R. pts. 160, 164; California's Confidentiality of Medical Information Act (CMIA), Civ. Code § 56 et seq., and specifically Civ. Code, § 56.10.)

Cal.App.3d 719, 721.) Likewise, communications between the patient and a nonclinician employee of a hospital that are found in a medical record may be confidential under section 5328 but may not be subject to the psychotherapist-patient privilege. Nonetheless, the psychotherapist-patient privilege—which is "broadly construed in favor of the patient" (*Stritzinger*, *supra*, 34 Cal.3d at p. 511)—is consistent with the Legislature's establishment of broad confidentiality provisions under section 5328 for LPS medical and other files generated in providing services to the proposed conservatee.

### 4. *Conclusion: LPS Trials Are Presumptively Nonpublic*

The outcome of an LPS trial to determine whether a proposed conservatee is gravely disabled turns on the opinions rendered by expert witnesses, i.e., clinicians who have treated the person, forensic mental health experts, or both. (See 2 Cal. Conservatorship Practice, *supra*, Conservatorships for the Gravely Disabled Under the LPS Act, § 23.82, pp. 1371-1372.) This testimony is based in large part upon patient records and communications with the patient; these are matters subject to the confidentiality provisions of section 5328, and they may also be protected from disclosure by the psychotherapist-patient privilege of Evidence Code section 1014.[31] It would be anomalous—and contrary to the express intent of the Legislature to protect the "dignity [and] privacy" of the patient (§ 5325.1, subd. (b))—to enforce the confidentiality provisions of section 5328 outside of the courtroom, but to ignore such confidentiality

---

[31] We have previously on our own motion taken judicial notice of the reporter's transcripts of the LPS jury trials involving Sorenson in Monterey County Superior Court case numbers MH005082 (occurring on June 7-10, 2011) and MH005129 (occurring on November 28-30, 2011). In that order, we directed that the transcripts would be designated "Confidential" and would be subject to review only by authorized court personnel. After reviewing those court transcripts, we may state categorically—but without revealing any of the contents thereof—that the trial transcripts contain a significant amount of material that is subject to the confidentiality provisions of section 5328 and/or is protected from disclosure by the psychotherapist-patient privilege of Evidence Code section 1014.

44

and forfeit the patient's psychotherapist-patient privilege and privacy rights once the matter proceeds to trial.

Likewise, it would be incompatible with the protections afforded to the patient under section 5328 and Evidence Code section 1014 to construe section 5118 to require that only certain LPS *hearings* be presumptively nonpublic, while allowing public access to confidential and sensitive patient information presented as evidence at LPS *trials*. Reading section 5118 in this fashion would effectively penalize the proposed conservatee for demanding a jury trial under subdivision (d) of section 5350. We will not impose such an interpretation here " 'that would lead to absurd consequences.' " (*People v. Sinohui*, *supra*, 28 Cal.4th at p. 212; see also *Cory v. Board of Administration* (1997) 57 Cal.App.4th 1411, 1424 [rejecting interpretation of statute that "would yield bizarre results"].)

Furthermore, permitting LPS trials to be presumptively public—thereby making public any confidential communications between the proposed conservatee and his or her psychiatrists or psychologists—would be antithetical to one of the legislative purposes of confidentiality under the LPS Act. That purpose is "to encourage persons with mental or alcohol problems to seek treatment on a voluntary basis." (*County of Riverside v. Superior Court*, *supra*, 42 Cal.App.3d at p. 481; cf. *In re Lifschutz*, *supra*, 2 Cal.3d at p. 431 [in construing exception to psychotherapist-patient privilege, "we are necessarily mindful of the justifiable expectations of confidentiality that most individuals seeking psychotherapeutic treatment harbor."].)[32]

---

[32] Although section 5118 calls for LPS proceedings, including trials, to be presumptively nonpublic, the statute permits "*any* party to the proceeding" to demand that it be public. (Italics added.) Because we are concerned here with an order impacting the proposed conservatee's privacy and patient confidentiality rights, we do not address a theoretical circumstance of competing concerns in which the party prosecuting the LPS conservatorship petition demands that the proceedings be public, while the proposed conservatee objects because an open proceeding would violate his or her right to (1) records confidentiality under section 5328, (2) privacy under article I, section 1 of the

"[G]rave disability proceedings carry special threats to reputation. A finding of grave disability is equivalent to a finding that a person is unable to feed, clothe or house himself [or herself] because of a mental disorder. (§ 5008, subd. (h)(1).)" (*Conservatorship of Roulet*, *supra*, 23 Cal.3d at p. 229.) Those who are "confined to mental institutions are stigmatized as sick and abnormal during confinement, and in some cases, even after release.' " (*Conservatorship of Susan T.*, *supra*, 8 Cal.4th at p. 1023 (Mosk, J., conc. & dis.); see also *Conservatorship of Roulet*, at p. 229 [consequences of civil commitment include " 'the stigma of mental illness . . . that could be a socially debilitating as that of a criminal conviction' "].) A conclusion that LPS trials are presumptively public proceedings would cause proposed involuntary conservatees to suffer the embarrassment and stigma of public scrutiny to their alleged mental difficulties and to their personal psychiatric records. (Cf. *In re S.W.*, *supra*, 79 Cal.App.3d at p. 721 [one of purposes of § 5328 is to avoid "embarrassment" resulting from "undesired publicity" through disclosure of LPS treatment records].) We therefore read section 5118, in context with section 5328 and other provisions of the LPS Act—and in a manner consistent with the patient's privacy right and right to assert confidentiality under the psychotherapist patient privilege—as providing that all LPS proceedings, including court trials, jury trials and other hearings under the Act, are presumptively nonpublic. (See *People v. Dixon*, *supra*, 148 Cal.App.4th at p. 427 [concluding, as dictum, that language of section 5118 "suggests that the proceedings are private unless the parties request otherwise"].)

D. *Whether the Parties, in Effect, Demanded Public LPS Trials*

Although the trial court concluded, as do we, that LPS trials are presumptively nonpublic under section 5118, it held that in this instance, the parties were "deemed to

California Constitution, and (3) confidentiality under the psychiatrist-patient privilege codified under Evidence Code section 1014.

have 'requested' that the hearings be public." Sorenson contends this was error. Although the People argue that the court properly allowed access to the LPS trial transcripts, they concede that the court's decision was "wrong in its rationale." We conclude that the court erred in finding that the parties were deemed to have requested public hearings.

The People's evidence that was the basis of the court's conclusion that the parties were "deemed" to have requested public trials consisted of (1) the declaration of the bailiff, Deputy Sheriff Sonia Angelo, and (2) the declaration of Assistant District Attorney Steven Somers. Deputy Angelo declared that she was the bailiff for the two LPS jury trials; "the courtroom was unlocked and open to the public" for both trials; "[t]he public did come and go freely during both jury trials"; and to her knowledge, no one objected to the courtroom remaining open. Somers's declaration consisted of a recitation of the substance of statements he received from Annette Cutino, Deputy County Counsel, to the effect that the courtroom was unlocked during both jury trials; LPS hearings "for years" had been held in open court; and that parties to LPS hearings had "always operated as though the hearings were required to be public." Somers also declared that he had spoken to Superior Court Judge Sam Lavorato, who had said "that he always operated upon the belief that the [LPS] hearings were required to be held publicly."

The court below acknowledged from its review of the minutes that "neither party expressly requested a public hearing in the two trial cases."[33] It relied, however, upon the two aforementioned declarations in concluding that the parties had effectively requested public trials. In addition, it noted that at the conclusion of the trials, "the trial judge lifted

---

[33] We have reviewed the reporter's transcripts from the two LPS jury trials involving Sorenson occurring in June 2011 and November 2011. (See fn. 31, *ante*.) There is nothing in the record from either trial indicating that either party demanded that the proceedings be public.

his admonition and permitted the jurors to discuss the case[s] and deliberations without limitation" and "the court record" does not disclose that either party objected to such admonitions.

The Somers declaration consists of inadmissible hearsay (see Evid. Code, § 1200, subd. (b); *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 608-609) to which Sorenson objected. Indeed, the People admit that this evidence was improper hearsay. Although the court did not rule on the objection, we infer from its reliance upon the Somers declaration that it implicitly overruled the objection. The court erred in admitting this declaration and considering it as evidence in support of its ruling. Therefore, the only evidence properly considered on the issue of whether the parties effectively requested public LPS trials consisted of the statements in the Angelo declaration and the trial judge's admonitions to the jury in both LPS trials to which there were apparently no objections.

Section 5118 calls for nonpublic LPS proceedings unless a party makes a "demand" that they be public. In this context, this suggests the party's affirmative assertion of a legal right, rather than passive inaction. (See *Westrec Marina Management, Inc. v. Arrowood Indem. Co.* (2008) 163 Cal.App.4th 1387, 1392 [demand defined as "a request for something under an assertion of right or an insistence on some course of action"]; Black's Law Dict. (9th ed. 2009), p. 495, col. 1 ["[t]he assertion of a legal or procedural right"].) Furthermore, given the nature of the evidence at LPS trials—which includes testimony of clinicians and other psychiatrists and psychologists that undoubtedly involves patient communications—a determination that the proposed conservatee has been deemed (through silence) to have demanded a public trial is also a ruling that he or she has impliedly waived the psychotherapist-patient privilege under Evidence Code section 1014. As we have noted, this privilege is construed broadly in favor of the patient and any exceptions are construed narrowly. (*Story v. Superior Court*, *supra*, 109 Cal.App.4th at p. 1014.) And, as our high court stated in the context of a

claimed waiver of the psychotherapist-patient privilege, "[t]he waiver of an important right must be a voluntary and knowing act done with sufficient awareness of the relevant circumstances and likely consequences." (*Roberts v. Superior Court* (1973) 9 Cal.3d 330, 343; see also *San Diego Trolley, Inc. v. Superior Court* (2001) 87 Cal.App.4th 1083, 1091-1092.)

Under these circumstances, the undisputed admissible evidence—namely, the bailiff's statement that the courtrooms were not closed and the trial judge's having released the jurors from the admonitions—does not support the finding that the parties had effectively demanded that the LPS trials be public.[34] The court therefore erred in authorizing real parties in interest to have access to the transcripts of those trials in contravention of section 5118.[35]

## DISPOSITION

Respondent superior court erred in its order permitting real parties in interest the People, The Herald, and The Californian access to copies of the reporter's transcripts of

---

[34] We disregard Angelo's statement that to her knowledge no one objected to the courtroom remaining open; this statement is not competent on the issue of whether an objection was asserted. (Evid. Code, § 702, subd. (a).)

[35] Our opinion does not address whether the People, by virtue of Sorenson's entry of a not guilty by reason of insanity plea approximately nine months after entry of the challenged order, are now entitled in these criminal proceedings to copies of the LPS jury trial transcripts or other LPS files. We acknowledge that Sorenson's change of plea may have now provided the People with a basis for receiving copies of the transcripts under an exception to the psychotherapist-patient privilege. (See Evid. Code, § 1016, subd. (a); *People v. Lines* (1975) 13 Cal.3d 500, 512.) This case addresses only the court's unsealing, over Sorenson's confidentiality objection, of the entire reported trial record of the two LPS trials. While the court was correct in holding that LPS trials are presumptively nonpublic, it erred in finding that the parties "requested" that the proceedings be public. Our opinion should not be construed as an impediment to the making of a proper motion to unseal an LPS court record, in whole or in part, or as a restriction on the trial court's authority to act upon such motions in accordance with the principles set forth herein. (See *Marriage of Nicholas*, *supra*, 186 Cal.App.4th at pp. 1574-1578; Cal. Rules of Court, rule 2.551(h).)

the jury trials conducted in two LPS proceedings involving petitioner Sorenson (Monterey County Superior Court case numbers MH005082 and MH005129). Accordingly, let a peremptory writ of mandate issue commanding respondent superior court to vacate its order and enter a new order denying the People's, The Herald's, and The Californian's motion for access to these transcripts.  Upon finality of this opinion, the temporary stay issued by this court is vacated.


                                                  Márquez, J.


WE CONCUR:


Rushing, P.J.


Elia, J.

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Superior Court Nos.: SS112361,<br>MH4621, MH4654, MH4924,<br>MH4928, MH4934, MH5082,<br>MH5119, MH5129 |
| Trial Judge: | The Honorable<br>Mark E. Hood |
| Attorneys for Petitioner<br>Christopher Sorenson: | James S. Egar<br>Public Defender<br>Donald Earl Landis Jr.<br>Assistant Public Defender<br>Monterey County Public Defender's Office |
| Attorneys for Real party in Interest<br>The People: | Dean D. Flippo<br>District Attorney for Monterey County<br>Glenn Pesenhofer<br>Deputy District Attorney |
| Attorneys for Real party in Interest<br>The Monterey County Herald: | James M. Chadwick<br>David E. Snyder<br>Sheppard, Mullin, Richter & Hampton LLP |

Sorenson v. The Superior Court of Monterey County (The People)
H038295